# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | |
|---|---|
| MURPHY-HOFFMAN COMPANY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 09-00227-CV-W-FJG |
| | ) |
| BANK OF AMERICA, N.A., | ) |
| | ) |
| Defendant. | ) |

## ORDER

Currently pending before this Court is defendant's Motion to Dismiss (Doc. No. 7).

## I. BACKGROUND

Plaintiff Murphy-Hoffman Company ("MHC") brought this action against defendant Bank of America, N.A. ("BOA") alleging three counts in its complaint: (1) frustration of commercial purpose, (2) breach of agreement to provide financial services, and (3) negligent misrepresentation.

MHC sells and leases trucks through its various dealerships and rental facilities spread across ten states. In order to finance its operations, MHC has established a line of credit with PACCAR, referred to as Pledgeline. Prior to 1999 and at all time periods relevant to this action, MHC has maintained this line of credit with PACCAR. The interest rate associated with the Pledgeline is a floating, or variable, rate which is determined by an index listed regularly in the Wall Street Journal ("WSJ index").

In June 1999, after becoming aware of MHC's Pledgeline variable interest rate, BOA approached MHC and introduced the company to a concept known as "interest rate swap" agreements. BOA gave a detailed presentation, including a slideshow and promotional

materials, to MHC extolling the benefits of entering into a rate swap agreement with BOA. BOA informed MHC that the rate swap agreement would insure that MHC would pay a fixed interest rate on the money borrowed through the Pledgeline. As part of the rate swap agreement, MHC and BOA would enter into transactions where MHC would pay a fixed interest rate on an agreed upon a fixed amount of money referred to as the "notional amount." BOA, on the other hand, would pay interest to MHC based on a floating interest rate on the notional amount. Thus, if the floating interest rate fell below the fixed interest rate at a certain point each month, MHC would end up owing BOA money on that transaction. However, if BOA's floating interest rate rose above the fixed rate in a given month, BOA would owe MHC the amount of interest in excess of the fixed rate. In order for MHC to effectively hedge its exposure to the Pledgeline's floating interest rate, the Pledgeline's floating rate and the rate swap agreement's floating rate would have to move in the same direction and by the same amount.

In July 1999, BOA and MHC entered into the International Swap Dealers Association, Inc., ("ISDA") Master Agreement, which outlined the parties' interest rate swap agreement and set forth the general terms under which the parties would enter into the periodic transactions described above. The rate swap agreement consisted of the ISDA Master Agreement, the schedule to the ISDA Master Agreement, the Amendment to the ISDA Master Agreement, and Confirmations, which are various letter agreements concerning each specific transaction entered into under the Master Agreement. The floating interest rate BOA paid MHC under the agreement was a Federal Reserve commercial paper floating interest rate, known as USD-CP-H.15 non-financial index ("Fed index"). Plaintiff alleges that neither party knew, or MHC knew and did not disclose, that

2

the Fed index could vary from the Pledgeline's floating rate, which was based on the WSJ index. From the outset of the agreement up until September 2007, the two floating rates generally moved in the same direction and any variance was minimal. Thus, during this period of time, the rate swap agreement effectively hedged MHC's risk in its credit transactions under the Pledgeline. However, starting in September 2007 and continuing up until the termination of all transactions by MHC in March 2009, the WSJ index and the Fed index (collectively referred to as "interest rate indices") substantially diverged from one another, with the Fed index interest rate falling substantially lower than the WSJ index. The divergence rendered the rate swap agreement an ineffective hedge to MHC's Pledgeline since MHC would be paying a high variable interest rate for the Pledgeline but not receiving an equally high variable interest rate from the rate swap agreement.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 8 provides: "[a] pleading that states a claim for relief must contain: a short plain statement of the claim showing that the pleader is entitled to relief[.]" Rule 8 further provides that "[p]leadings must be construed so as to do justice." In construing a pleading, the court must consider whether the pleading provides notice of the claims being asserted against the defendant. See Shelter Mutual Ins. Co. v. Public Water Supply, 747 F.2d 1195, 1197 (8th Cir. 1984).

The Supreme Court issued a new standard to apply when considering motions to dismiss. In Bell Atlantic Corp. v. Twombly, 550 U.S. 540 (2007), the Supreme Court rejected the "no set of facts" language from Conley v. Gibson, 355 U.S. 41 (1957). The Court stated:

While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not

3

> need detailed factual allegations, . . . a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . . Factual allegations must be enough to raise a right to relief above the speculative level . . .on the assumption that all the allegations in the complaint are true (even if doubtful in fact) . . . .

Id. at 555 (internal citations and quotations omitted). The Court went on to note that, "of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." Id. at 556 (internal citations and quotations omitted). The Court emphasized that "we do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face. Id. at 570. In a later case, the Supreme Court noted that "a case has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009).

When considering a motion to dismiss, courts are still required to accept the complaint's factual allegations as true. Twombly, 550 U.S. at 555. All reasonable inferences from the complaint must be drawn in favor of the nonmoving party. Crumpley-Patterson v. Trinity Lutheran Hosp., 388 F.3d 588, 590 (8th Cir. 2004). "In considering a motion to dismiss, courts accept the plaintiff's factual allegations as true, but reject conclusory allegations of law and unwarranted inferences." Silver v. H & R Block, Inc., 105 F.3d 394, 397 (8th Cir. 1997).

### III. DISCUSSION

MHC alleges three claims against BOA: (1) frustration of commercial purpose, (2) breach of agreement to provide financial services, and (3) negligent misrepresentation.

4

BOA seeks dismissal of all three claims based on the statute of limitations and failure to state a cause of action. The Court shall address each argument in turn below.

### A. Statute of Limitations

BOA argues that all of MHC's claims are barred by the Missouri 5-year statute of limitations applicable to contract and negligence actions. It states that MHC knew about all the facts relevant to its claims, including the existence of damages, beginning in 1999, when BOA advised MHC to enter into the swap agreement and the parties began conducting transactions under the rate swap agreement. MHC does not dispute the applicability of the Missouri 5-year statute of limitations; however, it argues that its claims did not accrue until the floating interest rates substantially diverged in 2007 and significant financial damage ensued.

According to Missouri law, the statute of limitations is triggered when damage from a breach of a duty is "sustained and is capable of ascertaining," not when the actual breach took place. Mo. Rev. Stat. § 516.100. As such, the crucial inquiry pertaining to the statute of limitations issue is at what point did MHC sustain ascertainable damages. In its complaint, MHC states that from 1999 to September 2007, the Fed index and the WSJ index tracked each other closely; any disparity was minor and the transactions during this period effectively hedged its exposure to its Pledgeline floating rate. The disparity between the indices that MHC suffered before September 2007 were anticipated, and it did not suffer damages from the transactions until a substantial divergence in the floating interest rates manifested. Therefore, the Court provisionally finds that any damages sustained from BOA's breach became ascertainable in September 2007, and the claims are not barred by

5

the statute of limitations.

### B. MHC's Claims

#### 1. Frustration of Commercial Purpose

MHC's purpose in entering into the rate swap agreement with BOA was to "hedge its exposure to increases in the Pledgeline floating interest rate." Compl. ¶ 16. MHC alleges that BOA knew of MHC's purpose, and that neither party expected that the Fed index would "substantially diverge" from the WSJ index. As a direct and proximate result of this divergence, the transactions entered into between the parties under the rate swap agreement no longer effectively hedged MHC's risk.

BOA moves to dismiss this count for various reasons. First, while BOA apparently acknowledges a cause of action based on frustration of purpose exists, it argues that the theory does not apply where the event that frustrates the commercial purpose of the agreement is foreseeable. BOA states that both parties contemplated losses as a result of the agreement due to disparities between the floating interest rate BOA paid and the fixed interest rate MHC paid in return. Because losses were foreseeable by both parties, defendant argues that it is irrelevant what actually caused MHC's losses. Second, BOA argues that frustration of commercial purpose does not provide relief where the rate swap agreement was based on inherently risky and contingent events, such as the volatility of the Fed index.

MHC responds that BOA mischaracterizes the event that frustrated the commercial purpose of the parties' agreement. While MHC certainly foresaw that it could lose money the floating interest rate dipped below the fixed interest rate, MHC did not foresee that the

6

interest rate indices would substantially and materially diverge from one another. MHC states that the Fed index and WJS index were designed to measure prevailing commercial interest rates. It believes that the substantial divergence between these rates beginning in 2007 was a result of the credit crisis that unfolded during that period.

BOA replies that the agreement between BOA and MHC does not contain any assurances regarding the outcome of any transactions executed under the agreement. Thus, defendant contends that MHC cannot now seek to disavow its acceptance of the risk inherent in its transactions with BOA by arguing that it agreed only to assume the risk of discrepancies between the fixed interest rate and the floating interest rate within the rate swap agreement.

Both parties cite to the Restatement (Second) of Contracts as laying out the elements to a theory of frustration of commercial purpose. The theory requires that "a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made[.]" Restatement (Second) of Contracts § 265 (1981). At issue here is whether the substantial divergence between the floating interest rates was foreseeable. While MHC could certainly foresee losses from engaging transactions within the swap agreement, it is entirely plausible that neither party reasonably foresaw the divergence between the interest rate indices.

Although the rate swap agreement itself was an inherently risky agreement due to the floating interest rate MHC paid, BOA does not argue that the overall strategy to hedge MHC's exposure to its floating interest rate in the Pledgeline line of credit was an inherently risky or contingent event. Contra Strauss v. Long Island Sports, Inc., 60 A.D.2d 501, 504

7

(N.Y. App. Div. 1978) (trading of Julius "Dr. J." Erving to another basketball team could not be basis for a season ticket holder's frustration of purpose claim where the trade was a foreseeable event). As alleged in MHC's complaint, BOA sought out MHC, introduced MHC to the concept of rate swap agreements, and conveyed the how the swap agreement would hedge MHC from exposure in the Pledgeline by effectively converting the variable interest rate in that agreement to a fixed rate. Compl. ¶¶ 8-10. It is plausible that nearly identical movements of the two floating rates was not an uncertain or contingent event; in fact, it would make sense that the rates would track each other given that the tracking of the two floating rates would be necessary to effectively hedge MHC's risk in the Pledgeline line of credit.

For the foregoing reasons, the Court **DENIES** defendant's motion to dismiss as to Count I.

### 2. Breach of Agreement to Provide Financial Services

MHC alleges that "BOA offered to provide financial advice and services to MHC regarding MHC's use of interest rate hedging strategies." Compl. ¶ 24. BOA referred to itself as a member of MHC's "advisory team" and "management team" while representing that it could provide tailored solutions to MHC's financial needs. In support of its claim, MHC claims it accepted BOA's "offer" to provide financial advice and services and entered into the rate swap agreement in consideration for BOA's financial advice. BOA breached its agreement by failing to make certain that the Fed index would track the progression of the WSJ index, failing to ascertain MHC's rate exposure in the Pledgeline, and advising MHC to enter into transactions that utilized the divergent rate indices.

8

BOA moves to dismiss this count based on several clauses in the parties' written rate swap agreement. BOA first points to a "non-reliance" provision in the rate swap agreement indicating that neither party relied on any oral or written representation made by the other party as a recommendation or financial advice. Also, the agreement states that the parties are capable of independently evaluating the risks of each transaction entered into under the rate swap agreement, and that neither party is acting as an advisor to the other. BOA argues that any oral contract for financial advice is barred by application of the parol evidence rule and the agreement's merger clause, which expressly states that the written agreement represents the entire agreement and supercedes any previous oral communications or writings.

In response, MHC states that BOA acted as a financial advisor to MHC in exchange for the opportunity to sell financial instruments to it. MHC argues that BOA's mere denial of the existence of an agreement to provide financial services cannot support the dismissal of this count. With respect to the "non-reliance" provision and the merger clause in the rate swap agreement, MHC argues that those provisions apply only to the rate swap and transactions, not to the agreement to provide financial advice. MHC states that the "non-reliance" provision applies only to risks inherent in the rate swap agreement itself, such as the risk that the BOA's floating interest rate would fall below MHC's fixed interest rate, which would result in MHC paying BOA the difference. However, the risk of divergent floating rate indices is not barred by the merger clause because the financial advice rendered was part of a separate agreement wherein BOA provided financial advice and products to MHC.

9

Under New York law,[1] the elements of a breach-of-contract action are "(1) formation of a contract between plaintiff and defendant; (2) performance by plaintiff; (3) defendant's failure to perform; and (4) resulting damage[.]" Clearmont Property, LLC v. Eisner, 58 A.D.3d 1052, 1055 (N.Y. App. Div. 2009). BOA argues that MHC cannot bring a breach of contract claim if the allegations are belied by the express language of the contract. BOA asserts that the non-reliance provision belies on claim that it was serving as a financial advisor to MHC. See K3C, Inc. v. Bank of America, N.A., 204 Fed. Appx. 455 (5th Cir. 2006) (unpublished opinion). At issue in K3C, Inc. was whether a lender breached a fiduciary duty to its borrower when the parties entered into an interest rate swap agreement. The parties had an existing lender-borrower relationship prior to the rate swap agreement, and the parties entered into a rate swap agreement to hedge interest rates on the borrower's loans it had with lender. The court found that there was not a fiduciary relationship between the parties due, in part, to the fact that the parties were a lender and a borrower, and the rate swap agreement was entered into in that context. Id. at 461. The court noted that the rate swap agreement confirmed its finding because the agreement disclaimed that any party was acting as a fiduciary for the other. Id.

In the present case, the factual scenario is distinguishable in that the parties' relationship appears to be more nuanced than that of a borrower and a lender. MHC entered into the rate swap agreement with BOA in the context of hedging the risk from a

---

[1] It is unclear whether the laws of New York or Missouri, where the agreement for financial services was presumably made, would apply to the purported agreement to provide financial services since the agreement is not necessarily a part of the ISDA Swap Agreement, which contained the New York choice-of-law provision. However, the Court need not resolve this issue at this point because its result would be the same under either law.

10

third-party credit transaction.  Also, in this case, the parties entered into an agreement for BOA to provide financial advice and products for MHC's financial Pledgeline exposure, which was distinct from the rate swap agreement.  The swap agreement was allegedly a contract within a broader agreement to provide financial strategies, such as how to hedge MHC's financial risks.

Furthermore, the merger clause and non-reliance provision do not necessarily bar the financial services agreement.  These written provisions specifically apply to each transaction entered into by the parties under the rate swap agreement.  This provision could be interpreted as applying only to each respective transaction under the swap agreement and any representations made with respect to that transaction, or it could mean that the provisions apply to all of the dealings between the parties, including the offering of financial advice and strategies.  Because it is reasonable to infer that the provisions applied only to the communications specifically related to a certain transaction, and not all the dealings between the parties, the claim is not necessarily barred by these provisions.

Also, BOA claims that MHC waived its breach of contract claim as a matter of law because it continued its performance under the swap agreement despite of BOA's purported breach in 1999.  See Albany Medical College v. Lobel, 296 A.D.2d 701, 703 (N.Y. App. Div. 2002).  This argument similarly fails because the floating rates did not substantially diverge until September 2007, and according to the "Confirmations" attached to defendant's motion, which are a part of the rate swap agreement, MHC did not enter into any further transactions following that date.

For the above reasons, the Court **DENIES** defendant's motion to dismiss as to Count II.

11

### 3. Negligent Misrepresentation

MHC alleges that BOA negligently misrepresented that the transaction entered into under the rate swap agreement would effectively hedge MHC's exposure to the Pledgeline floating interest rate. Given that the swap agreement and transactions did not effectively hedge MHC's risk beginning in September 2007, the above representation proved false. MHC states that as its financial advisor, BOA had a duty to provide appropriate strategies to accomplish MHC's financial goals and ensure that the two floating interest rates moved in the same direction and by the same amount. MHC alleges that BOA knew or should have known of the falsity of its statements and the fact that it would mislead MHC. Also, BOA sought to induce MHC's reliance upon its statements in order for MHC to enter into the swap agreement and transactions.

BOA responds that MHC cannot state a cause of action for negligent misrepresentation for various reasons. First, BOA argues that MHC has failed to adequately allege a special or fiduciary relationship between the parties. Second, as discussed in the previous section, BOA argues that the MHC agreed in the rate swap agreement to disclaim any reliance upon BOA's communications as financial advice. Third, even if the disclaimer does not apply, New York law does not recognize a negligent misrepresentation action when the representation is promissory in nature or relates to future events. Finally, BOA argues that the factual allegations underlying this claim do not meet the required level of specificity under Fed. R. Civ. P. 9(b).

MHC responds that Fed. R. Civ. P. 8 does not require it to specifically allege in its complaint a special or fiduciary relationship between itself and BOA to adequately present its claim. Further, MHC notes that in its complaint, it does allege that BOA was a part of

MHC's "advisory team" and "management team."  Compl. ¶ 24.  As for the swap agreement's non-reliance and merger clauses, MHC refutes that these provisions bar a claim for negligent misrepresentation as it relates to BOA's communications made regarding the effectiveness of the swap agreement to hedge its risk against the floating rate in the Pledgeline.  Language in the swap agreement should not negate BOA's obligations in its role as a financial advisor to MHC; a role that was not governed by the terms of the written swap agreement.  MHC argues that the non-reliance provision and similar language in the agreement relates to potential swings in the Fed index used for transactions in the rate swap agreement.

The Court finds that plaintiff has sufficiently pled a cause of action under negligent misrepresentation to survive a motion to dismiss.  Plaintiff states several facts support the conclusion that BOA was a financial advisor to MHC.  For example, BOA itself characterized itself as a member of MHC's advisory and management team and stated that it was providing tailored solutions to MHC's business needs.[2]  These facts are sufficient to raise a reasonable inference that a fiduciary or special relationship existed between the parties.

Also, the provisions in the rate swap agreement do not necessarily preclude a negligent misrepresentation claim.  As explained in the above section relating to the breach of contract claim, the non-reliance and merger provisions in the written agreement can be

---

[2] Furthermore, it is not clear whether the choice-of-law provision in the ISDA Swap Agreement applies to representations made outside the specific context of that agreement; therefore, it is possible that the law of Missouri, where the statements were presumably made, would apply here.  Under Missouri law, plaintiff need not show a special or fiduciary relationship necessarily; rather, the statements must have been conveyed to plaintiff "during the course of his business or because of some other pecuniary interest," Chubb Group of Ins. Companies v. C.F. Murphy & Assoc., Inc., 656 S.W.2d 766, 783 (Mo. Ct. App. 1983), which was allegedly the case here.

13

read either to disclaim all representations and financial advice attributable to BOA or they can be read to disclaim only representations made as to the efficacy of each specific transaction within the rate swap agreement. If the latter interpretation applies, then statements made as to the general effectiveness of hedging strategies or the adequacy of the Fed index would not be barred by the swap agreements provisions.

Furthermore, the Court disagrees with BOA that the representations it made necessarily relate to future events or promissory statements. BOA represented that the rate swap strategy would effectively hedge its exposure to increases in the variable interest rate in the Pledgeline agreement, which turned out to be false when the floating interest rates began to substantially diverge. Compl. ¶ 29. BOA explained to MHC that the rate swap agreement would ensure that MHC would pay, in effect, a fixed interest rate on credit transactions made under the Pledgeline agreement. Compl. ¶ 9. In order for that to happen, the two floating interest rates would have to move in the same direction and by the same amount. Compl. ¶ 10. BOA's statement that MHC would effectively pay a fixed interest rate in its Pledgeline transactions and that the two floating interest rate indices would move in the same direction are factual assertions, thus a negligent representation theory may be pursued here.

Finally, the Court finds that the pleading requirements relating to fraud under Fed. R. Civ. P. 9(b) do not apply to a negligent misrepresentation theory. See Fidelity National Title Ins. Co. of New York v. Intercounty National Title Ins. Co., 161 F. Supp. 2d 876, 887 (N.D. Ill. 2001).

For the foregoing reasons, the Court **DENIES** defendant's motion to dismiss as to Count III.

Case 4:09-cv-00227-FJG   Document 18   Filed 08/14/09   Page 14 of 15

**IV.    CONCLUSION**

For the foregoing reasons, the Court **DENIES** defendant's Motion to Dismiss (Doc. No. 7).[3]

**IT IS SO ORDERED.**


Date:   08/14/09                                              **S/ FERNANDO J. GAITAN, JR.**
Kansas City, Missouri                                         Fernando J. Gaitan, Jr.
                                                              Chief United States District Judge

---

[3]Defendant also requests that plaintiff pay defendant's attorney fees as the swap agreement provides for in the event of a default.  Because this action is set to continue, the Court provisionally denies defendant's request for attorney fees.